IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JERMAINE STAGGERS,

    *Plaintiff*,

    v.

XAVIER BECERRA, SECRETARY,
U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES.

    *Defendant*.

Civil Action No. ELH-21-0231

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Jermaine Staggers, an employee of the United States Department of Health and Human Services (the "Department" or "HHS"), filed suit against Norris Cochran, then the Acting Secretary of the Department, alleging employment discrimination based on gender (Count I) as well as retaliation (Count II), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). ECF 1 (the "Complaint").[1] Staggers, a male employee, is a GS-13 Health Insurance Specialist at the Department, in the Centers for Medicare and Medicaid Services ("CMS"). He seeks both legal and equitable relief. *Id*. at 8-11. I shall sometimes refer to CMS and HHS interchangeably as the "Agency."

Defendant has filed a motion to dismiss for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, for summary judgment. ECF 3. The motion is supported by a memorandum of law (ECF 3-1) (collectively, the "Motion"), as well as twelve exhibits. ECF 3-3 to ECF 3-14. Plaintiff opposes the Motion (ECF 6), supported by a memorandum (ECF 6-2)

---

[1] I previously directed the Clerk to substitute Xavier Becerra, the current Secretary of the Department, as the defendant, pursuant to Fed. R. Civ. P. 25(d). *See* ECF 12.

(collectively, the "Opposition") and a Declaration under Fed. R. Civ. P. 56(d).   ECF 6-1. Defendant has replied (ECF 9, the "Reply") and submitted an additional four exhibits.  ECF 9-1 to ECF 9-4.  In addition, plaintiff has filed a "Motion for Leave to File Surreply."  ECF 10 (the "Motion for Surreply").  The Motion for Surreply is accompanied by the proposed surreply (ECF 10-1, the "Surreply") and five exhibits.  ECF 10-2 to ECF 10-6.[2]

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion for Surreply; construe the Motion as a motion to dismiss; and grant the Motion in part and deny it in part.

### I. Motion for Surreply

The filing of a surreply is within the Court's discretion.  *See* Local Rule 105.2(a).  "But, they are generally disfavored." *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013)*, aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g., Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013).  A surreply is ordinarily permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted).

This is the unusual circumstance in which permitting a surreply is appropriate.  As I discuss, *infra*, a significant point of disagreement between the parties concerns whether conversion of the Motion to one for summary judgment is appropriate.  In the Opposition, Staggers argues

---

[2] On December 6, 2021, while the Court was working on the motions, counsel for Staggers submitted a motion to withdraw as counsel.  ECF 11.  The motion to withdraw included the certification required by Local Rule 101.2(a)(2).  ECF 11-1.  Therefore, on December 7, 2021, the Court granted counsel's motion to withdraw, but gave plaintiff until December 20, 2021, to move to rescind the Order as improvidently granted.  ECF 12.  However, because the motions are fully briefed, I shall proceed to resolve them.

that summary judgment is premature, given the need for discovery.  ECF 6 at 18-20; ECF 6-1.  In the Reply, defendant counters that Staggers had an adequate opportunity to conduct discovery during the administrative stage.  ECF 9 at 7-12.  This contention was raised for the first time in the Reply, and the Surreply seeks to respond by making specific arguments as to the inadequacy of discovery during the administrative process.  *See* ECF 10-1.

It is appropriate to permit Staggers to make these arguments, which provide vital context as the Court considers whether summary judgment is premature.  Accordingly, I shall grant the Motion for Surreply.

## II. Factual Background[3]

The plaintiff, Jermaine Staggers, "is an African-American male."  ECF 1, ¶ 4.  At all times relevant to this action, he worked in the "Division of Issuances, Issuance, Records, and Information Systems Group, Office of Strategic Operations and Regulatory Affairs" ("OSORA") at CMS.  *Id.* ¶ 6.  Since 2010, he has been a "Health Insurance Specialist" at the grade of "GS-0107-13."  *Id.*

At all relevant times, except between March and October 2018, Janis Nero, a female, was plaintiff's "direct line supervisor."  *Id.* ¶ 7.  Materials that I may consider indicate Nero's title was "Acting Director, Division of Issuances," and "Deputy Director, Issuances, Records, and Information Systems Group."  ECF 3-9 at 2; ECF 3-10 at 2.  Between March and October 2018, plaintiff's "second line supervisor," Carlos Simon, acted as plaintiff's "first line supervisor due to the issues created by Ms. Nero's mistreatment of Mr. Staggers."  ECF 1, ¶ 15.

---

[3] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

On or about August 25, 2017, Nero "decided to add Mr. Staggers to the Manual Updates Team and sent Mr. Staggers and two others an email announcing her plan." ECF 1, ¶ 9.[4]  Although the Complaint offers little detail on the work of the Manual Updates Team, the team seems to have handled updates to various CMS policy manuals so as to provide "accurate information to Medicare and Medicaid stakeholders and beneficiaries."  ECF 3-9 at 2.

Staggers responded in an email of August 28, 2021, claiming that he was already "carrying a full workload," and "that there were other members of his department . . . that had lighter workloads," and they "were better equipped to take on the updating tasks that Ms. Nero planned to assign" to plaintiff.  ECF 1, ¶ 10.  However, Nero "ignored [these] legitimate issues," directed Staggers to report for training, and "informed him that the assignment was mandatory and that if he refused it, he could be subject to disciplinary action."  *Id.* ¶ 11.  According to Staggers, after he was forced to take on these additional assignments related to manual updating, "he began to have difficulty completing all of the tasks he had been assigned in an appropriate and timely manner."  *Id.* ¶ 12.

Further, plaintiff alleges that Nero assigned work to him that was outside of his "position description," including work that was supposed to be performed by her.  ECF 1, ¶ 13.  Following an internal grievance filed by Staggers on September 22, 2017, Nero changed plaintiff's position description "without telling him or providing him with a copy of his new position description in violation of the Master Labor Agreement, Article 28, ¶¶ 3A-B."  *Id.* ¶ 14.  However, no further information as to this internal grievance, the change in the position description, or the "Master Labor Agreement" and its contents is provided in the Complaint.

---

[4] The Complaint refers to this team variously as the "Manual Updates Team," *see* ECF 1, ¶ 9, as well as the "Manual Updating Team."  *See id.* ¶¶ 25, 43.

On or about March 29, 2018, Staggers contacted Michael Tutnauer, an Equal Employment Opportunity ("EEO") counselor at the Agency, "to lodge a complaint regarding his unlawful treatment at the hands of Ms. Nero." ECF 1, ¶ 16.  Plaintiff alleges that "the Agency became aware of Mr. Staggers' protected activity by no later than March 29, 2018." *Id.*

In April 2018, Staggers communicated with Nero and Simon by telephone and email regarding what he characterizes as his "excessive workload." *Id.* ¶ 17.  He sought "guidance regarding the order of priority of the many assignments he had been given, and to implore them to divide the work fairly among the available Agency employees," including his asserted comparators, discussed *infra. Id.*

Simon "summoned" Staggers to a meeting on April 6, 2018, at which he "scolded Mr. Staggers with his voice raised and threatened Mr. Staggers with termination if he was unable to complete the unreasonable amount of work he had been assigned." *Id.* ¶ 18.  Thereafter, on April 11, 2018, Simon, "upon information and belief at the request of Ms. Nero, directed Mr. Staggers to provide him with a status report as to his work five times a day "until he decided Mr. Staggers was handling his assignments in an acceptable manner." *Id.* ¶ 19.  Specifically, Staggers was to provide Simon with a status report each day at 8:00 a.m., 10:00 a.m., noon, 2:00 p.m., and 3:00 p.m. *Id.*  Staggers alleges that this caused him "embarrassment and emotional harm," and also diverted him from time he could devote to his actual assignments. *Id.* ¶ 20.

On April 13, 2018, Simon referred Staggers to the Employee Assistance Program ("EAP"). *Id.* ¶ 22.  According to Staggers, Simon failed to recognize that plaintiff's inability to timely complete his work was due to his excessive workload and Simon's reporting requirements. *Id.* Instead, Simon "concluded that Mr. Staggers' health, well-being and inability to balance his work and familial responsibilities were preventing him from performing at an acceptable level." *Id.*

5

Throughout the summer of 2018, Nero and Simon continued to make disproportionate assignments to plaintiff, and ignored his requests as to "why he was being singled out" for the volume of work and what work he should prioritize.  ECF 1, ¶ 26.  At one point, Ronda Bonner-Allen, a colleague of Staggers and one of his asserted comparators, approached Staggers to inquire why he was assigned his work "separately from the rest of the team" and why he was "not included in team meetings."  *Id*. ¶ 25.  However, no other allegations are included in the Complaint as to any exclusion from meetings.

As noted, Staggers had contacted an Agency EEO counselor in March 2018, but "efforts to resolve the complaint were unsuccessful."  *Id*. ¶ 34.  On June 26, 2018, the Agency notified Staggers of his right to file a formal complaint of discrimination.  *Id*.  Staggers did so on July 19, 2018, which was "accepted in part" by the Agency, "as communicated in a letter" of August 21, 2018.  *Id*. ¶ 35.[5]  The complaint alleged sex discrimination and retaliation based upon the events recounted above, but claimed that Staggers was assigned excessive work beginning in July 2017. ECF 3-11 (the Agency complaint) at 3, 6-8.  Thereafter, Staggers amended his complaint three times: August 28, 2018; September 20, 2018; and November 14, 2018.  ECF 1, ¶ 36.  However, the Court has not been provided with copies of the amendments.

On August 21, 2018, "at the direction" of Nero, Simon "sent Mr. Staggers an email criticizing him for failing to timely complete three manual updates thereby rendering them inaccurate and ordered him to complete them within three business days."  *Id*. ¶ 27.  Simon "demanded" that Staggers provide updates on his work "multiple times each day."  *Id*.

---

[5] Although the Complaint does not identify the recipient of the letter, the Final Agency Decision specifies that the letter was issued to plaintiff. ECF 3-12 at 3.

6

Thereafter, on August 29, 2018, Nero issued Staggers a "Written Counseling Memorandum" ("WCM"). ECF 1, ¶ 28; ECF 3-9 (the WCM). The WCM was the "result of [plaintiff's] purported inability to handle the inappropriate workload that he had been assigned." ECF 1, ¶ 28. The WCM included a "laundry list of criticisms" of Staggers, *id.*, and recounts that plaintiff "missed the deadline" for submission of the list of CRs for the week of August 13-17, 2018.[6] ECF 3-9 at 2. Further, plaintiff was "ordered . . . to undertake additional work and complete additional tasks in an objectively unreasonable timeframe." ECF 1, ¶ 28.

According to the WCM, the Agency "performed an audit to ensure that all manual updates are posted by the respective implementation date. The audit revealed that [Staggers] failed to complete several manual updates that have been assigned to [him] over the past year." ECF 3-9 at 2. Moreover, it stated that plaintiff's "inappropriate handling" of his work required several of plaintiff's assigned tasks to be redistributed to his coworkers. *Id.*

Accordingly, the WCM "direct[ed Staggers] to complete all assigned CRs prior to the implementation date, meet established deadlines and respond timely to all management requests." *Id.* In particular, the WCM referenced three CRs that had already been assigned to Staggers with an original due date of August 29, 2021, and directed him to complete them, along with a fourth CR, by September 6, 2021. *Id.* at 2-3. The WCM also instructed Staggers to provide Nero with email status updates every day at 9:00 a.m., noon, and 3:00 p.m., "or at the conclusion of [his] tour of duty, whichever comes first." *Id.* at 3.

In the WCM, Nero stated she was "confident" that, based on plaintiff's past experience, he had the ability to perform his assignments. *Id.* In addition, Nero indicated that she was available

---

[6] Although not specified in the Complaint, "CR" appears to refer to a "change request" to update a particular CMS policy manual. *See* ECF 3-12 at 5.

to provide "continuous feedback and close supervision." ECF 3-9 at 3. Nero reiterated that she expected Staggers to "diligently work towards independently and successfully accomplishing all assigned work in a timely manner as expected by a Health Insurance Specialist at [his] grade and experience." *Id.*

As part of the Agency's "Scheduled Flexiplace" program, Staggers had been working from home on Mondays and Fridays since 2014. ECF 1, ¶ 29. However, in the WCM, Nero revoked plaintiff's Flexiplace authorization, thereby requiring him to work from the office five days a week. ECF 3-9 at 3-4. Nero asserted that eligibility for Flexiplace was only available to employees who do "not require close supervision, continuous feedback, or face-to-face contact with management or co-workers." *Id.* at 3. Based on plaintiff's performance, however, he required close supervision and face-to-face contact with management. *Id.*

The WCM reiterated the availability of the EAP, but did not require Staggers to participate in it. *Id.* at 4. Finally, the WCM provided that it would be placed in Nero's "Supervisory Working File." *Id.* The WCM reflects that on August 29, 2018, Staggers refused to sign it. *Id.*

On or about November 8, 2018, Nero issued a "Direct Order" to Staggers as to his work. ECF 1, ¶ 31; ECF 3-10 (the Direct Order). According to the Direct Order, plaintiff had "several past due assignments that are adversely affecting Agency Issuances operations." *Id.* at 2. Therefore, Staggers was directed to complete seven "past due" assignments by November 15, 2018, *i.e.*, within five business days. *Id.*; ECF 1, ¶ 31. According to the Direct Order, the deadline of November 15, 2018, was "more than enough time to complete past due assignments." ECF 3-10 at 2. Further, it noted that plaintiff had "successfully completed multiple manual updates since September 2017, validating" his ability to perform. *Id.* However, Staggers alleges that Nero

"knew this demand was unreasonable, and that Mr. Staggers would be unable to comply with it at the time she made it." ECF 1, ¶ 31.

In the Direct Order, Nero scheduled a meeting for November 15, 2018, to discuss plaintiff's work. ECF 3-10 at 1. She also reiterated that she was available to provide "continuous supervision and close feedback" to Staggers as he completed his work, and instructed him to contact her if he encountered an "obstacle beyond [his] control." *Id.*

Like the WCM, the Direct Order advised Staggers of the availability of the EAP, and noted that the document would be placed in Nero's Supervisory Working File. *Id.* at 2. But, unlike the WCM, the Direct Order contained an explicit threat of discipline. Plaintiff was warned as follows: "Failure to follow this direct order may result in disciplinary action being taken against you, up to and including your removal from the Federal service." *Id.*

The Complaint does not allege any further developments following issuance of the Direct Order. Moreover, no discipline is alleged, nor has plaintiff identified any consequences flowing from the Direct Order. And, the Complaint does not reflect that Staggers has left HHS. ECF 1, ¶ 6 ("Since 2010 . . . Staggers was employed as a Health Insurance Specialist . . . at CMS.").

Throughout his Complaint, Staggers references four "GS-13-level female subordinates" of Nero as asserted comparators: Kathleen Singer, Deborah Smith, Janice Pinn, and Ronda Bonner-Allen. *Id.* ¶ 8. He alleges, without detail, that these individuals "were subject to the same employment policies as Mr. Staggers, performed similar job tasks and responsibilities, and, prior to the discriminatory and retaliatory conduct that forms the basis for this action, had similar job performance evaluations and disciplinary history." *Id.* Furthermore, he alleges that none of the comparators has ever been ordered to report to Nero or Simon on a regular basis; none has ever been referred to EAP due to issues with timely completion of assignments; none was ever issued

a WCM by Nero; and none was ever issued a Direct Order by Nero as a result of a failure to complete work assignments. *Id.* ¶¶ 21, 23, 30, 32.

As indicated, plaintiff's EEO complaint was accepted by the Agency on August 21, 2018, and was later amended three times. On May 6, 2019, the Agency issued a "Report of Investigation and notice of election rights." *Id.* ¶ 37. On May 23, 2019, Staggers requested a hearing before an Administrative Judge of the Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 38. As described, *infra*, in the summer of 2020, the Administrative Judge issued a ruling concerning discovery that, in plaintiff's view, "made it virtually impossible for [him] to prepare for his hearing." *Id.* As a result, Staggers withdrew his request for a hearing on August 31, 2020. *Id.* ¶ 39. An Order of Dismissal was issued on September 1, 2020. *Id.* ¶ 39. The Agency issued a Final Agency Decision ("FAD") on October 29, 2020. *Id.* ¶ 40; *see* ECF 3-12 (the FAD).

The FAD is a comprehensive, 35-page, single-spaced document. It thoroughly reviewed the procedural and factual background pertinent to the disputes, as well as the applicable law. Of plaintiff's seven claims of discrimination and retaliation, the FAD found that Staggers had failed to establish a prima facie case for six of them. ECF 3-12 at 9-27, 30-34.[7] As to the seventh claim—retaliation based on the WCM—the FAD found that Staggers had established a prima facie case, but that the Agency had articulated a legitimate, nondiscriminatory reason for its conduct, and Staggers had failed to demonstrate that this proffered reason was a pretext. *Id.* at 27-30.

This litigation followed. Additional facts are included in the Discussion.

---

[7] The Agency had previously dismissed an eighth claim because Staggers had raised it in a negotiated grievance procedure. ECF 3-12 at 34. In addition, Staggers had also asserted retaliation based on prior union activity as a partial basis for four of his claims, but the Agency had previously dismissed those allegations. *Id.*

### III.  Standard of Review

### A.

As noted, the Motion is styled as a "Motion to Dismiss Or, In the Alternative, For Summary Judgment."  ECF 3.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[8]

---

[8] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*.

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). As the Fourth Circuit has said, a summary judgment motion prior to discovery "forces the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 Fed. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

Here, defendant seeks summary judgment prior to discovery.  And, as noted, Staggers has filed a Rule 56(d) affidavit, in the form of the Declaration of his counsel.  *See* ECF 6-1.  The Declaration avers: "Plaintiff is unable to properly respond to Defendant's Motion for Summary Judgment without the opportunity to conduct basic discovery."  *Id*. ¶ 1.  In particular, the Declaration identifies two specific areas where discovery is believed to be vital: plaintiff's case as to comparators, and issues as to motive and pretext.  *Id*. ¶¶ 2-4.  For comparators, Staggers asserts a need to depose Nero and the alleged comparators, as well as to obtain their personnel records.  *Id*. ¶ 2.  For motive, Staggers seeks to depose Nero and Simon, and also to obtain their contemporaneous communications.  *Id*. ¶ 3.  In the Opposition, Staggers elaborates that this discovery relates to "critical issues" such as the motivation for revoking plaintiff's Flexiplace work arrangement; whether the comparators are similarly situated; and whether defendant's proffered legitimate rationale "is no more than a pretext."  ECF 6-2 at 19-20.

The case of *McCray*, 741 F.3d 480, is informative.  In *McCray*, the Fourth Circuit considered whether the district court erred when it granted summary judgment to the defense before plaintiff had an opportunity to conduct discovery.  *Id*. at 483.  The plaintiff in *McCray* had been an employee of the defendant for many years, before she filed an EEOC Charge alleging, *inter alia*, discrimination under Title VII, based on race and gender.  *Id*. at 481-82.  In the district court, the defendant sought to dismiss the case, but the plaintiff sought an opportunity to conduct discovery.  *Id*. at 482.  The district court denied plaintiff's Rule 56(d) motion because the parties had engaged in discovery during the EEOC investigation and had submitted substantial documentary evidence in support of their positions.  *Id*.  Therefore, the court converted the defendant's motion to one for summary judgment.

Notwithstanding the significant administrative record, the Fourth Circuit reiterated on appeal that discovery is appropriate when "the main issue" is "one of motive" and when "most of the key evidence lies in the control" of the party moving for summary judgment.  *Id*. at 484.  The Court recognized that the plaintiff's Title VII claims required the plaintiff to show "that she was fired because of discriminatory reasons," and that such evidence was within the control of the defendant.  *Id*.  "Absent discovery," said the Court, the plaintiff lacked "adequate access to this evidence, and therefore no way to shield herself from a premature summary judgment motion." *Id*.  Therefore, the Court concluded that summary judgment was premature.  *Id*. at 481, 484.

Defendant vigorously contends that summary judgment is not premature.  It points to the exhaustive Report of Investigation prepared as part of the administrative process, which included, *inter alia*, affidavits from both Simon and Nero.  ECF 9 at 9; *see* ECF 3-6 (Nero Affidavit); ECF 3-8 (Simon Affidavit).  HHS also notes that, during the discovery period at the administrative stage, Staggers propounded both interrogatories and requests for production, and he received over

14

900 pages of documents.  ECF 9 at 9-10.  Plaintiff also had the opportunity to conduct depositions, although ultimately he did not do so.  *Id*. at 9-10; ECF 9-4 (deposition correspondence).  In short, defendant asserts that plaintiff's discovery request constitutes an inappropriate attempt to "find out if [he] has a claim, rather than that [he] has a claim for which [he] needs ... discovery," and it involves "a purely speculative hope that" Nero and Simon "will recant their sworn testimony." *McKinnon v. Blank*, DKC-12-1265, 2013 WL 781617, at *11 (D. Md. Feb. 28, 2013) (internal citations omitted) (alterations in original).

In response, plaintiff identifies several ways in which administrative discovery was allegedly deficient.  In particular, he explains that the Administrative Judge set a relatively short discovery period of two and a half months, from June 17, 2020 to August 31, 2020.  ECF 10-1 at 3; ECF 10-2 at 2-3.  Dispositive motions were due September 15, 2020.  ECF 10-1 at 3.  Plaintiff's counsel propounded his interrogatories and document requests on June 18, 2020, the day after discovery began.  *Id*.  On July 13, 2020, Agency counsel requested a two-week extension for its response.  *Id*.; ECF 10-3 at 3.  Concerned that this would leave only four weeks to "review what was produced, resolve deficiencies, and prepare for and take depositions," plaintiff's counsel agreed to this extension subject to Agency counsel's commitment not to object to an extension of the discovery deadline.  ECF 10-1 at 3-4; ECF 10-3 at 1-2.  On August 3, 2020, the Agency produced some 900 pages of documents, which plaintiff asserts were often duplicative of documents already produced and had "multiple deficiencies."  ECF 10-1 at 4; *see* ECF 10-4 (letter of plaintiff's counsel).  For example, they were missing all emails sent or received by Simon, and communications between Simon, Nero, and Olen Clybourne, who appears to have been the Deputy Director of OSORA.  *See* ECF 3-12 at 6-7.  ECF 10-1 at 4; ECF 10-4.  Because Simon was no longer employed by CMS, Agency counsel stated that his emails were not retained and could not

be produced.  ECF 10-1 at 4.  Agency counsel was not available to speak with plaintiff's counsel regarding these matters until August 20, 2020.  *Id*. at 4; ECF 10-5 at 2.

Given the impending discovery deadline, the parties jointly moved to extend discovery on August 26, 2020.  ECF 9-4 at 3; ECF 10-1 at 3.  But, the Administrative Judge denied this motion just ten minutes after it was made.  ECF 9-4 at 3; ECF 10-1 at 3.  Although the Administrative Judge specified that depositions could occur after the deadline, she did not alter the dispositive motions deadline of September 15, 2020.   ECF 9-4 at 3; ECF 10-1 at 4.  And, the proposed dates for Nero's deposition were Thursday, September 10, 2020 or Friday, September 11, 2020, leaving little time before September 15, 2020, to incorporate her testimony into any motions.  ECF 10-1 at 4.  Furthermore, plaintiff was unable to depose Simon because by that point he had left CMS. *Id*.  In view of these discovery deficiencies—including an inability to depose Simon or obtain his emails, and the belated opportunity to depose Nero—plaintiff withdrew from the administrative hearing process.  ECF 3-12 at 3; ECF 10-1 at 5.

As in *McCray*, the parties here had the opportunity to conduct some discovery during the EEOC administrative process.  But, the discovery was limited.  And, as in *McCray*, plaintiff seeks discovery on issues pertinent to motive and pretext.

Ordinarily, denial of additional discovery is appropriate when the materials sought by the requesting party could have been discovered earlier, including in the course of administrative discovery.  *See Volochayev v. Sebelius*, 513 Fed. App'x 348, 351-52 (4th Cir.2013); *see also Newsom v. Barnhart*, 116 Fed. App'x 429, 432 (4th Cir.2004) (affirming district court's denial of discovery request, "[g]iven the breadth of the administrative record"); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 612 (D. Md. 2003) (determining that summary judgment was not premature because a "full and detailed factual record" had already been created).   Indeed, the *McCray* Court

recognized that "nonmovants do not qualify for Rule 56(d) protection where they had the opportunity to discover evidence but chose not to." *McCray*, 741 F.3d at 484.  But, it concluded that the principle did not apply in that case because there was "no indication that McCray's inability to gather evidence was due to her own delay." *Id.*

Plaintiff's Rule 56(d) affidavit seeks discovery about the "motivations" of Nero and Simon concerning their alleged adverse actions. ECF 6-1, ¶ 3.  And, the issues of pretext and motive are precisely those for which the *McCray* Court recognized the importance of discovery in the trial court.  741 F.3d at 484.  Moreover, the parties dispute when Nero became aware of plaintiff's EEO activity.  *See* ECF 3-5 at 3 (plaintiff asserts "soon after" March 29, 2018); ECF 3-6 at 3 (Nero asserts "about November 2018"); ECF 9 at 7 (Reply, citing Nero's date).  And, this issue is significant because "a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [him] engaging in protected activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).  If Nero learned about plaintiff's protected activity after issuance of the Direct Order on November 8, 2018, then there is no causal link.  On the other hand, if Nero learned about plaintiff's protected activity in November 2018, but prior to November 8, then the inference of retaliation is extremely strong, based on temporal proximity.  And, if Nero learned about plaintiff's protected activity well before November 2018, then an inference of retaliation is still possible, albeit not as strong.[9]

In light of plaintiff's asserted need for discovery as to pretext and motive; *McCray's* preference for discovery regarding such issues; and the legitimate deficiencies with the

---

[9] This is not to say that summary judgment would be impossible on this issue with a more fulsome record. After all, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But, this issue is not well-developed here.

administrative discovery, as described by plaintiff, I conclude that summary judgment is premature. Therefore, I will consider the Motion as a motion to dismiss.

### B.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal

theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy

sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for

summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal

rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted);  *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Under these principles, I may consider certain exhibits submitted with the Motion.  In particular, I may consider the Written Counseling Memorandum (ECF 3-9); the Direct Order (ECF 3-10); plaintiff's EEO complaint of July 19, 2018 (ECF 3-11); and the FAD (3-12).  These documents are referenced in the Complaint and integral to it.  Furthermore, there is no dispute as to their authenticity.  However, given the nature of these documents, I do not necessarily regard their contents as true, except for plaintiff's EEO complaint, and I do not credit them over the factual allegations in the Complaint.  *Cf. Goines*, 822 F.3d at 167-68 ("[I]f a prisoner attaches an unfavorable decision from a prison tribunal to show that he has exhausted his administrative remedies, he does not thereby adopt the factual findings of that unfavorable decision. . . . [D]ocuments [prepared by or for the defendant] may reflect the defendant's version of contested

events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff.").

## IV.  Discussion

### A.  Title VII Generally

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2.  This proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision . . . ." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).  As to disparate treatment, an employer is barred from discriminating with respect to "terms, conditions or privileges of employment," which is "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).  And, the Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013).

Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3; *see e.g.*, *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Before filing suit under Title VII, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees),

*superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Trans.*, 662 Fed. App'x 221, 224 (4th Cir. 2016).  However, exhaustion under Title VII is not jurisdictional.  It is, instead, a "claim-processing rule[] that must be timely raised to come into play."  *Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019).

In general, at trial a plaintiff "may establish a discrimination claim under Title VII through two avenues of proof."  *Thomas v. Delmarva Power & Light Co.*, 715 Fed. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Nassar*, 570 U.S. 338).  The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997); *see Thomas*, 715 Fed. App'x at 302.  The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Sempowich v. Tactile Systems Technology, Inc.*, ___ F.4th ___, 2021 WL 5750450, at *3 (4th Cir. Dec. 3, 2021) (outlining the two approaches); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production" at trial.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  It is intended to be flexible, "not onerous," and is designed to uncover "circumstances which give rise to an inference of unlawful discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  But, "the *McDonnell Douglas* test is inapplicable

24

where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, it "is 'not intended to be an inflexible rule.'" *Young*, 575 U.S. at 228 (citation omitted).  And, even under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

Reference to these methodologies of proof often serves to inform a court's evaluation of a motion for summary judgment.  *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that "a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas Corp*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 Fed. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").  However, in resolving a Rule 12(b)(6) motion, the question for the court is whether the plaintiff has stated a plausible claim for relief. Nonetheless, reference to the elements of a prima facie claim helps to gauge the adequacy of the factual allegations in terms of plausibility.

To state a prima facie claim of discrimination under Title VII, the plaintiff generally must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)); *see Matias v. Elon Univ.*, 780 Fed. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 Fed. App'x 198, 203 (4th Cir. 2018).

As to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee. Rather, a plaintiff must only show that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes*, 922 F.3d at 225. And, with regard to adverse action, it must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 2021 WL 5750450, at *3 (citing *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 n.8 (4th Cir. 2020); *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)).

To state a prima facie claim of retaliation, a plaintiff must establish "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted); *see Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation."); *Johnson v. United Parcel Service, Inc.*, 839 Fed. App'x 781, 784 (4th Cir. 2021) (plaintiff may establish causal link by demonstrating that "the adverse act bears sufficient temporal proximity to

the protected activity"); *Strothers*, 895 F.3d at 335 ("[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden.").

At the motion to dismiss stage, however, a plaintiff need not establish a prima facie case of discrimination or retaliation. In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." Further, the Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 557 U.S. 1138 (2016).

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544. *See Littlejohn v. Cty. of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309. On the other hand, in *Twombly* the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods*, 855 F.3d at 648, the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" *See also*

*Swaso*, 698 Fed. App'x at 747-48 ("While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." (internal citations omitted)); *McCleary*, 780 F.3d at 584; *Coleman*, 626 F.3d at 190.   Accordingly, as noted, at the motion to dismiss stage the question "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'"   *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190).

## B.  Discrimination (Count I)

In the Motion, HHS argues that Staggers has failed to state a claim for gender discrimination because none of his alleged incidents qualify as "adverse employment actions," and because his comparators are flawed in various ways.   ECF 3-1 at 9-16.   Furthermore, the Department contends that even if Staggers has established a prima facie case, the Agency has articulated a legitimate, nondiscriminatory reason for its actions.   *Id*. at 21-22.

Staggers contests defendant's arguments as to adverse employment action and comparators.   ECF 6-2 at 4-12.   In addition, as noted, he argues that additional discovery is required on the issue of the comparators, as well as the issue of motive and pretext.   ECF 6-1; ECF 6-2 at 18-20.

Notably, "the existence of some adverse employment action is required" for a plaintiff to prevail on a Title VII discrimination claim.   *James v. Booz–Allen & Hamilton, Inc*., 368 F.3d 371, 375 (4th Cir. 2004).   An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"   *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Laird v. Fairfax Cty, Va.*, 978 F.3d 887, 893 (4th Cir. 2020) ("For a discrimination claim, the plaintiff must

show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'" (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) ("*Burlington Northern*"))).

However, "'not everything that makes an employee unhappy is actionable adverse action.'" *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011) (quoting *Settle v. Baltimore Cnty*., 34 F. Supp. 2d 969, 989 (D. Md. 1999)), *aff'd*, 465 Fed. App'x 274 (4th Cir. 2012).   And, "an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action."  *James*, 368 F.3d at 379.

Staggers alleges eight adverse employment actions: repeated, excessive work assignments, including some outside of his job description; the requirement to report his work status multiple times each day to his supervisors; the revocation of his Scheduled Flexiplace; being "berated and threatened" by his supervisors; his exclusion from Manual Updates Team meetings; the WCM; the Direct Order; and "[g]enerally being subjected to discipline and treatment that was inconsistent with the terms of the operative Master Labor Agreement because of his gender."  ECF 1, ¶ 43. But, none of these alleged actions qualifies as an adverse employment action under Title VII.  I address each, in turn.

Staggers complains that Nero added him to the Manual Updates Team, despite his full workload, and thereafter assigned him excessive work that was difficult for him to complete in a timely fashion.  *Id*. ¶¶ 10, 12, 22, 24, 26, 28, 31, 43.  He also alleges that he was assigned work outside of his "position description."  *Id*. ¶ 13.  Defendant disputes that Staggers was actually assigned excessive work.  ECF 3-1 at 11, 16; ECF 9 at 2.  But, assuming the truth of plaintiff's allegations, they do not rise to the level of an adverse employment action.

"'Additional duties' typically do not constitute adverse employment actions unless 'they are so weighty as effectively to change these basic terms of employment.'" *Vedula v. Azar*, TDC-18-0386, 2020 WL 5500279, at *9 (D. Md. Sept. 11, 2020) (quoting *Thorn*, 766 F. Supp. 2d at 599). Similarly, "[a] change to a new or different job assignment at the same salary level that is 'less appealing to the employee' or that causes 'modest stress not present in the old position,' constitutes an adverse employment action only where there was a 'significant detrimental effect,' such as '[a] decrease in compensation, job title, level of responsibility, or opportunity for promotion.'" *Vedula*, 2020 WL 5500279, at *8 (quoting *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2017)). *See also, e.g.*, *Edmonson v. Potter*, 118 Fed. App'x 726, 729 (4th Cir. 2004) ("A transfer in duties or reassignment that does not result in any decrease in salary, benefits, or rank cannot constitute an adverse employment action necessary to state a prima facie case of discrimination."); *Maine v. Azar*, GLR-16-3788, 2021 WL 3617215, at *13 (D. Md. Aug. 16, 2021) ("In general, reassignments, transfers, or changes to an employee's job responsibilities without a decrease in pay are not adverse employment actions unless they have a 'significant detrimental effect on his opportunities for promotion or professional development.'" (quoting *James*, 368 F.3d at 376)); *McKenzie-El v. Am. Sugar Refinery, Inc.*, RDB-20-0917, 2020 WL 7489021, at *6 (D. Md. Dec. 21, 2020) ("[T]o the extent [plaintiff] is complaining about being assigned additional work, such a claim does not constitute an adverse employment action."). Indeed, work would grind to a halt if every employee saddled with a new task or project could sue under Title VII. *See Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("Every job has its frustrations, challenges and disappointments; these inhere in the nature of work.").

Staggers has alleged that he was assigned additional work, including work outside of his job description. And, he has certainly alleged this additional work made his job less appealing,

more difficult, and stressful.  But, the facts alleged do not show a change in the basic terms of his employment.  He does not allege a decrease in compensation, job title, level of responsibility, opportunity for promotion, or similar detrimental effect of sufficient magnitude.

The two cases that Staggers cites as to reassignment both concern claims of retaliation.  *See Burlington Northern*, 548 U.S. at 71 (2006) (discussing reassignment in the context of retaliation); *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 785 (D. Md. 2010) (noting, in context of retaliation claim, that some courts have found "dirtier, more arduous, less prestigious, [and] objectively inferior" reassignment to be an adverse action) (internal quotations omitted).  In addition, Staggers cites several out-of-circuit cases for the general proposition that an action, such as a transfer, could be adverse even if it does not affect pay or benefits.  *See Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994) (stating that "transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action"; plaintiff was transferred "to a dead-end job that had effectively been eliminated before he was transferred to it"); *Collins v. State of Ill.*, 830 F.2d 692, 702-04 (7th Cir. 1987) (transfer to new job with uncertain and reduced responsibilities, along with other undesirable changes, was adverse action); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 592-93 (11th Cir. 1987) (assuming without deciding that transfer to different facility with different responsibilities as part of reduction in force was adverse action). But, Staggers makes no allegations sufficient to clear the required standard, and his alleged circumstances are very different than those in the cited cases.

Nor does plaintiff's allegation as to the reporting requirement qualify as an adverse action, despite the annoyance and inconvenience.  The reporting did not alter plaintiff's terms or conditions of employment, nor affect his job, beyond taking up his time and supposedly causing him "embarrassment and emotional harm."  ECF 1, ¶ 20.

31

Other judges in this District have found that close employer monitoring of an employee's activity does not constitute an adverse employment action.  *See, e.g.*, *Terry v. Perdue*, JKB-18-31, 2018 WL 4494883, at *6 (D. Md. Sept. 19, 2018) (audit of plaintiff's time records not adverse employment action); *Benton v. Burns*, PJM-15-2126, 2017 WL 491251, at *7 (D. Md. Feb. 7, 2017) ("[M]onitoring time and attendance is not an adverse employment action."); *Lindsey-Grobes v. United Airlines*, GJH-14-0857, 2014 WL 5298030, at *10 (D. Md. Oct. 14, 2014) (alleged monitoring not adverse action even under retaliation standard); *Wilson v. Susquehanna Bancshares, Inc.*, GLR-14-79, 2014 WL 2094039, at *4 (D. Md. May 19, 2014) ("allegedly monitoring . . . arrival and departure times" not adverse employment action); *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 587 (D. Md. Jan. 8, 2002) (plaintiff's allegation that "his activities were closely monitored" was not an adverse action in retaliation context).

As for the revocation of plaintiff's Flexiplace, both the Fourth Circuit and judges in this District have concluded that the termination of telework or alternative work privileges does not, without more, constitute an adverse employment action.  For example, Judge Blake has said: "[A]s courts in this circuit have frequently held, an employer's refusal to allow a flex schedule or telework arrangement, without more, does not rise to the level of an adverse employment action." *Walker v. Md. Dep't of Info. and Tech.*, CCB-20-219, 2020 WL 6393435, at *3 (D. Md. Nov. 2, 2020); *see also, e.g.*, *Parsons v. Wynne*, 221 Fed. App'x 197, 198-99 (4th Cir. 2007) (removal from alternate work schedule not adverse action even under lower retaliation standard); *Vedula*, 2020 WL 5500279, at *9 (letter of reprimand that revoked alternate work schedule and telework privileges was not an adverse employment action); *Terry*, 2018 WL 4494883, at *5; *Dailey v. Lew*, GLR-15-2527, 2016 WL 1558150, at *5-6 (D. Md. Apr. 18, 2016), *aff'd*, 670 Fed. App'x 142 (4th Cir. 2016).  And, Staggers has not alleged any consequence or negative effect from the revocation

of his Flexiplace arrangement, aside from having to come to work in person on Mondays and Fridays, nor anything more that might transform this denial into an adverse employment action. This is so notwithstanding plaintiff's conclusory allegation that revocation of Flexiplace "alter[ed] the terms of Mr. Staggers' employment." ECF 1, ¶ 29.

Staggers next points to being "berated and threatened" by his supervisors. ECF 1, ¶ 43. The only specific incident he cites is the meeting with Simon on April 6, 2018, at which Simon allegedly "scolded Mr. Staggers with his voice raised and threatened Mr. Staggers with termination if he was unable to complete the unreasonable amount of work he had been assigned." *Id*. ¶ 18. This single incident, even assuming it occurred as described, was not an adverse employment action. After all, Title VII is not "a general civility code for the American workplace," *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998), nor is it "a federal guarantee of refinement and sophistication in the workplace." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997).

The Fourth Circuit and judges in this District have said that incidents of yelling or bullying generally do not rise to the level of an adverse employment action. *See, e.g.*, *Adams v. Anne Arundel Cty. Pub. Schools*, 789 F.3d 422, 431 (4th Cir. 2015) ("upbraiding" of assistant principal by principal not adverse action when not linked to any material change in conditions of employment); *Vedula*, 2020 WL 5500279, at *8 ("[I]ncidents of yelling at an employee at a meeting and refusing to address employment-related complaints generally do not 'rise to the level of an adverse employment action for Title VII purposes.'" (quoting *Munday v. Waste. Mgmt. of N. Am., Inc*., 126 F.3d 239, 243 (4th Cir. 1997)); *Booth v. County Exec.*, 186 F. Supp. 3d 479, 485 (D. Md. 2016) (plaintiff's claims that his supervisor "humiliated him in two meetings, made jokes about him, and isolated him from other employees, while alleging mean-spirited behavior, do not

33

assert an adverse employment action"); *Blount v. Dep't of Health and Human Services*, 400 F. Supp. 2d 838, 842 (D. Md. 2004) ("[D]isparaging remarks made by a supervisor do not state an adverse employment action.").

Staggers has alleged a single incident involving a raised voice at a meeting on April 6, 2018.  At the meeting, Simon allegedly threatened Staggers with termination if he did not complete his assigned work.  But, Staggers was not terminated.  Indeed, plaintiff has not linked the incident to any material change in his conditions of employment, save Simon's email a week later, asking for multiple daily status reports.

Plaintiff also asserts that his exclusion from Manual Updates Team meetings and "[b]eing singled out with regard to how work was assigned to him" amounted to adverse employment actions.  ECF 1, ¶ 43.  Insofar as Staggers is referring to allegedly excessive work assignments, disproportionate from his colleagues, this does not qualify as an adverse employment action, as discussed earlier.  Staggers has made a vague allegation as to exclusion from meetings, without any claim as to how this impacted the terms or conditions of his employment.  Staggers never references any specific incident of exclusion, but indicates that on one occasion a coworker asked him why he was not included at team meetings.  ECF 1, ¶ 25.  But, "[e]xclusion from meetings does not, by itself, constitute an adverse employment action, as the issue in a discrimination claim is whether the exclusion had a significant detrimental effect."  *Engler v. Harris Corp.*, GLR-11-3597, 2012 WL 3745710, at *8 (D. Md. Aug. 28, 2012) (rejecting six-month exclusion from weekly meetings as basis for discrimination claim when complaint did not "allege any adverse action or significant detrimental effect resulting from [plaintiff's] inability to attend the weekly meetings"); *see also James*, 368 F.3d at 377 ("James' claim that he was excluded from 'important meetings' lacks specificity, and he fails further to substantiate how the alleged exclusions,

whatever they might have been, adversely affected him."); *Alexander v. Marriott Int'l*, RWT-09-2402, 2011 WL 1231029, at *9 (D. Md. Mar. 29, 2011) (in retaliation context, "[m]ere exclusion from meetings—absent any tangible, corresponding injury—is not conduct that would dissuade a reasonable worker from making or pursuing a charge of discrimination.").

Further, plaintiff argues that the WCM and the Direct Order constituted adverse employment actions. Both documents contain criticisms of plaintiff's work and reprimand him for failing to complete his work assignments in a timely manner. *See* ECF 3-9; ECF 3-10. Nero also offered to provide feedback and supervision, and she reiterated her expectation that Staggers must timely complete his assignments. Although plaintiff lost the privilege of working remotely two days a week, neither implemented any discipline.

The WCM did not contain any threat of discipline, and actually appears to have extended the deadline for completion of three CRs by a week. *See* ECF 3-9 at 2-3. The only concrete actions in the WCM were a requirement for Staggers to update Nero about his work three times a day, and the revocation of Flexiplace. In contrast, the Direct Order *did* contain a threat of discipline, including termination, if Staggers did not comply. ECF 3-10 at 2. But, there is no allegation that any discipline, or any other alteration in the terms and conditions of plaintiff's employment, followed from the Direct Order.

The Fourth Circuit has instructed that reprimands and poor performance reviews, without more, do not constitute an adverse employment action. *See Dortch v. Cellco Partnership*, 770 Fed. App'x 643, 647 (4th Cir. 2019) (per curiam) (reiterating that "'a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'") (citation omitted); *Adams*, 789 F.3d 422 at 431 (concluding that, for the purposes of a Family Medical Leave Act claim, "neither the

written nor the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline"); *James*, 368 F.3d at 377 ("[A] poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" (quoting *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000).

Judges in this District have reached similar conclusions. *See Thorn*, 766 F. Supp. 2d at 598 ("letter of counseling" that offered constructive criticism and cautioned that discipline could follow, but did not implement any discipline, was not adverse employment action); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) (oral or written reprimand does not constitute adverse employment action unless it works real, rather than speculative, employment injury); *Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 461 (D. Md. 2002) ("[D]iscipline, without evidence that the verbal reprimands or that a counseling letter could lead to further disciplinary action, such as termination, does not constitute an adverse employment action.").

In his Opposition, Staggers acknowledges that a reprimand does not constitute an adverse employment action unless it results in a real employment injury. ECF 6-2 at 11. But, he argues that he suffered an employment injury based on the WCM's revocation of Flexiplace. *Id.* As explained, the loss of this privilege lacks the legal significance Staggers attributes to it.

*Vedula*, 2020 WL 5500279, at *9, is instructive. There, Judge Chuang considered a "Letter of Reprimand" that revoked the plaintiff's telework and alternate work schedule privileges. *Id.* However, he concluded that the revocation was not an adverse employment action because it did not affect the terms and conditions of plaintiff's employment.

Staggers cites the case of *Barnes v. Charles Cty. Pub. Schools*, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam). *Barnes* affirmed a district court decision that a "letter of warning" amounted to an adverse action when it warned that "future disciplinary actions could result in further discipline, including termination." *Id.* But, it did so in the context of a retaliation claim, rather than a discrimination claim.

Both the WCM and the Direct Order also advised Staggers of the availability of the EAP. ECF 3-9 at 4; ECF 3-10 at 3. The Complaint also alleges that Simon previously issued a referral to the EAP for Staggers. ECF 1, ¶ 22. To the extent Staggers argues that these referrals were adverse employment actions, this is incorrect. These suggestions were not mandatory, and there is no suggestion Staggers ever suffered any consequences for not taking advantage of the EAP. As another court has noted: "[P]laintiff has not cited—and this Court has not found—a single case where a Court has held that referral to an EAP constitutes an adverse employment action. To the contrary, the weight of authority indicates that referral to an EAP does *not* constitute an adverse employment action under Title VII." *Ndzerre v. Wash. Metro. Area Transit Auth.*, 257 F. Supp. 3d 159, 166 (D.D.C. 2017) (emphasis in original).

Plaintiff's final asserted adverse employment action is that he was "[g]enerally . . . subjected to discipline and treatment that was inconsistent with the terms of the operative Master Labor Agreement because of his gender." ECF 1, ¶ 43. According to plaintiff, in October of 2017, Nero "changed Mr. Staggers' position description without telling him or providing him a copy of his new position description in violation of the Master Labor Agreement, Article 28, ¶¶ 3A-B." *Id.* ¶ 14. The Complaint provides no further information on the specifics of this change, the differences in the old and new position descriptions, the content of the Master Labor Agreement,

or any effects of this change.  Without more, it is impossible to say that the conduct constituted an adverse employment action.

As noted, "changes to an employee's job responsibilities without a decrease in pay are not adverse employment actions unless they have a 'significant detrimental effect on his opportunities for promotion or professional development.'"  *Maine*, 2021 WL 3617215, at *13 (quoting *James*, 368 F.3d at 376).  No such assertion is made with respect to this alleged change in plaintiff's position description.

To prevail on a Title VII discrimination claim, "'the existence of some adverse employment action is required.'"  *Holland*, 487 F.3d at 219 (quoting *James*, 368 F.3d at 375). Staggers has fallen short of alleging any such action.  Therefore, I shall grant the Motion with respect to Count I.

### C.  Retaliation (Count II)

### 1.  Retaliation Generally

Title VII contains protections against retaliation by an employer against an employee for engaging in certain kinds of protected activity.  In 42 U.S.C. § 2000e-3, it states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

The Fourth Circuit recently made clear in *Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021), that the *McDonnell Douglas* proof scheme applies to a retaliation claim.  Thus, "[a] plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence

or through the [*McDonnell Douglass*] burden-shifting framework." *Strothers*, 895 F.3d at 327

(citing *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).

As noted, to state a prima facie claim of retaliation, a plaintiff must allege "'that (1) the

plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the

employer acted adversely against the plaintiff; and (3) the protected activity was causally

connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see*

*Sempowich*, 2021 WL 5750450, at *6; *Strothers*, 895 F.3d at 327; *Guessous*, 828 F.3d at 217;

*Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 Fed. App'x 146, 151 (4th Cir. 2017); *Foster*, 787

F.3d at 250; *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 578 (4th Cir. 2015);

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).

The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected

activity' may fall into two categories, opposition and participation." *Navy Fed. Credit Union*, 424

F.3d at 406; *see Netter*, 908 F.3d at 937.  "An employer may not retaliate against an employee for

participating in an ongoing investigation or proceeding under Title VII, nor may the employer take

adverse employment action against an employee for opposing discriminatory practices in the

workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a). But, as the Fourth Circuit has

said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level

of formal charges of discrimination. The opposition clause has been held to encompass informal

protests, such as voicing complaints to employers or using an employer's grievance procedures."

*Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted).

In *Laughlin*, 149 F.3d at 259, the Court reiterated: "Opposition activity encompasses

utilizing informal grievance procedures as well as staging informal protests and voicing one's

opinions in order to bring attention to an employer's discriminatory activities."  And, "for an

employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937-38.

The second element is that of an "adverse action."  In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.)  In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim."  *Id.*; *see also Burlington Northern*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").  Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision."  *Strothers*, 895 F.3d at 327.

"An adverse action need not affect the terms and conditions of employment" in a retaliation claim.  *Barnes*, 747 Fed. App'x at 119.  But, there must be "some direct or indirect impact on an individual's employment . . . ."  *Adams*, 789 F.3d at 431.  So, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity."  *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68).

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667.  In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'"  *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).  Nor does "a personal conflict alone . . . constitute retaliation."  *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).  But "discharge, demotion, decrease in pay or benefits,

loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions. *Boone*, 178 F.3d at 255.

Judge Grimm has stated: "Even with this lower bar [for retaliation], none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted). This passage has been widely cited in this District. *See, e.g.*, *Draughn v. Wormuth*, RDB-20-3625, 2021 WL 5742236, at *8 (D. Md. Dec. 1, 2021); *Kelly v. Berryhill*, RDB-18-0049, 2019 WL 1300816, at *5 (D. Md. Mar. 20, 2019); *Lockley v. Town of Berwyn Heights*, JFM-14-825, 2015 WL 5334256, at *11 (D. Md. Sept. 11, 2015).

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani v. Palmetto Health*, 767 Fed. App'x 399, 421 (4th Cir. 2019). The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249. This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive requirement in Title VII's antidiscrimination provision. *See Foster*, 787 F.3d at 249-50.

Nevertheless, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *CSRA*, 12 F.4th at 417. Indeed, "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Roberts*, 998 F.3d at

41

127 (citing *Burgess v. Bowen*, 466 Fed. App'x 272, 283 (4th Cir. 2012)); *see CSRA*, 12 F.4th at 417.  As the Fourth Circuit explained in *Foster*, 787 F.3d at 250-52, "*Nassar* [did] not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim," because it did not require establishing but-for causation at the prima facie stage, and but-for causation is already required at the pretext stage.

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action [at the prima facie stage] 'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 Fed. App'x at 783-84); *see CSRA*, 12 F.4th at 417.  "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citing *Johnson*, 839 Fed. App'x at 783-84; *Lettieri*, 478 F.3d at 650 (recognizing that relevant evidence may be used to establish causation)).  Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 Fed. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).

To be sure, "temporal proximity suffices to show a causal relationship." *Sempowich*, 2021 WL 5750450, at *6.  In *Strothers*, 895 F.3d at 335-36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine*, 411 F.3d at 501 ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." (citing *Dowe*, 145 F.3d at 657)).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. Therefore, a "'lengthy time lapse

between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id*. (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003)). Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc*., 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

But, as indicated, temporal proximity is not the sole avenue to allege and later show causation. *CSRA*, 12 F. 4th at 417. Rather, temporal proximity is one of two paths to show causation. As noted, the other path contemplates "the existence of facts indicative of an adverse action "'because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citation omitted).

As with a Title VII discrimination claim, at the motion to dismiss stage a plaintiff need not establish a prima facie claim, but merely "must allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190); *see also Swaso*, 698 F. App'x at 747-48; *Woods*, 855 F.3d at 648; *McCleary-Evans*, 780 F.3d at 584.

## 2.   Analysis

It is uncontested that Staggers engaged in protected activity for the purpose of Title VII's antiretaliation provision.   However, HHS disputes that the Agency acted adversely, and it also contests a causal connection between plaintiff's protected activity and any alleged adverse action. ECF 3-1 at 17-21.   Moreover, it argues that even if Staggers has established a prima facie case, the Agency has articulated a legitimate, nondiscriminatory reason for its actions.   *Id*. at 21-22.

Staggers challenges defendant's arguments as to adverse action and causal connection. ECF 6-2 at 13-18.   In addition, he contends that additional discovery is required as to the issue of motive and pretext.   ECF 6-1; ECF 6-2 at 18-20.

Plaintiff's retaliation claim is premised upon many of the same alleged incidents as his discrimination claim.   Specifically, Staggers cites Simon's alleged berating of plaintiff at their meeting on April 6, 2018; his reporting requirement; Simon's referral of Staggers to the EAP; the WCM and its revocation of Flexiplace; the Direct Order; and the repeated assignment of excessive work and work outside of plaintiff's job description.   ECF 1, ¶ 48.

The alleged berating by Simon, the reporting requirement, the EAP referral, the Flexiplace revocation, and the change to plaintiff's job description do not constitute adverse actions under Title VII's antiretaliation provision.   Plaintiff has not alleged that the meeting with Simon on April 6, 2018, the reporting requirements, or the EAP referral resulted in any sort of meaningful "injury or harm," *Burlington Northern*, 548 U.S. at 67, beyond a minor inconvenience or unpleasantness. Moreover, Staggers provides virtually no detail as to the change in the position description, nor does he allege a connection between this change and any injury or harm.

These incidents are best described as the type of "petty slights or minor annoyances," *id*. at 68, "personal conflict[s]," *Spencer*, 919 F.3d at 208, or "verbal reprimand[s]," *Wonasue*, 984 F.

Supp. 2d at 492, that do not qualify as adverse actions.  *See also Adams v. Upper Chesapeake Med. Ctr., Inc.*, AMD 08-346, 2009 WL 997103, at *4 (D. Md. Apr. 14, 2009) ("[O]ccasional yelling from a boss does not rise to the level of a materially adverse employment action" under *Burlington Northern* retaliation standard).

As for revocation of Flexiplace, the Fourth Circuit has found that "removal from [an] alternate work schedule would [not] have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Parsons v. Wynne*, 221 F. App'x 197, 198-99 (4th Cir. 2007) (quoting *Burlington Northern*, 548 U.S. at 68); *see also Alexander*, 2011 WL 1231029, at *8 ("[A] a reasonable worker would not find revocation of a privilege to work from home sufficiently adverse to dissuade [him] from complaining about discrimination."); *Thorn*, 766 F. Supp. 2d at 603 ("The agency's insistence that [plaintiff] return to an ordinary work schedule . . . was also not an adverse action.").  Therefore, revocation of plaintiff's Flexiplace eligibility does not rise to the level of an adverse action.

As alleged, Staggers was assigned to the Manual Updates Team and thereafter allegedly received excessive work assignments.  Courts in this District have found that a "change in duties" that is less appealing to an employee is not a materially adverse action.  *Thorn*, 766 F. Supp. 2d at 603.  Similarly, even "irritating," "arbitrary," or "time-consuming" new job duties do not qualify as materially adverse actions, as long as the "new tasks 'are not dirtier, more arduous, less prestigious, . . . objectively inferior, [or] possess[ing] [of] any analogous attribute.'"  *Tawwaab*, 729 F. Supp. 2d at 784 (quoting *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009)).  Although Staggers certainly disliked his new assignments, he does not allege that the new tasks were considered less prestigious or objectively inferior.  However, he has certainly alleged that the new tasks were time-consuming in relation to his existing workload, and that his assignments were

45

"more arduous."  The alleged excessive assignments might dissuade a reasonable worker from engaging in protected activity.

But, even assuming the additional work was a materially adverse action, plaintiff has failed to allege the necessary causal connection between this new work and any protected activity. Staggers claims he was added to the Manual Updates Team by Nero, initiating the allegedly increased workload, in August 2017.  ECF 1, ¶¶ 9-11.  This was a month before the earliest alleged protected activity—plaintiff's apparent internal grievance of September 22, 2017 (*id.* ¶ 14)—and much earlier than the protected activity that forms the major basis for plaintiff's claim, which began with his complaint to an Agency EEO Counselor in March 2018.  *Id.* ¶¶ 16, 33-40, 47-49.

Although Staggers continued to receive new work throughout 2018, as alleged, this stemmed from his original assignment to the Manual Updates Team.  It is unclear from the allegations whether Nero was aware of plaintiff's protected activity.  Yet, there cannot be an inference of retaliatory intent if the protected activity occurred *after* the allegedly adverse action. *See, e.g.*, *Francis*, 452 F.3d at 309 ("'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" (citation omitted)); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 274 (4th Cir. 2001) ("[Events in question] could not be retaliatory, because [plaintiff's] contact with the EEO did not cause these acts of reprisal, but, instead, the alleged acts of 'reprisal' caused [plaintiff] to seek EEO relief."); *White v. ACell, Inc.*, GLR-20-173, 2021 WL 3911999, at *13 (D. Md. Sept. 1, 2021) ("[T]he Fourth Circuit has found that such an inference [of retaliation] does not arise where the actions leading to an employee's termination occurred before the employee's protected activity."); *Myles-Anderson v. Emmes Corp.*, GJH-15-2461, 2017

WL 881812, at *4 (D. Md. Mar. 3, 2017) (plaintiff did not establish causation when "the actions that led to Plaintiff's termination began before her complaint") (emphasis in original).

This leaves the WCM and the Direct Order.  As noted, a number of decisions in this District, and elsewhere in the Fourth Circuit, have found that reprimands of this sort do not constitute materially adverse action.  *See, e.g.*, *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 831-33 (E.D. Va. 2016) (thoroughly analyzing this issue and concluding that "reprimands without collateral consequences are akin to non-actionable snubbing, antipathy, and petty slights" and "cannot be characterized as 'adverse.'"), *overruled in part on other grounds by Bostock v. Clayton Cty.*, ___ U.S. ___, 140 S. Ct. 1731 (2020); *Stoyanov v. Mabus*, 126 F. Supp. 3d 531, 550 (D. Md. 2016) ("The letter of reprimand itself, even when assessed under the reasonable employee standard, is not an adverse employment action."); *Muldrow v. Blank*, PWG-13-1200, 2014 WL 938475, at *10 (D. Md. Mar. 10, 2014) (formal letter of reprimand and proposed termination not adverse action); *Wonasue*, 984 F. Supp. 2d at 492 (same); *Thorn*, 766 F. Supp. 2d at 593-94, 603 ("letters of counseling" and "unwarranted reprimands" not adverse actions).  But, this approach has not been unanimous.  *See Smith v. Bd. of Educ. of Prince George's Cty.*, GJH-16-206, 2016 WL 4014563, at *4-5 (D. Md. July 26, 2016) (written reprimand, in the form of a "Letter of Professional Counseling," constituted adverse action);[10] *Howerton v. Bd. of Educ. of Prince George's Cty.*, TDC-14-0402, 2015 WL 4994536, at *17-18 (D. Md. Aug. 19, 2015) ("reprimand letters placed in an employee's personnel file" could sometimes be adverse actions).

But, in *Barnes*, 747 F. App'x at 119, a per curiam opinion, the Fourth Circuit affirmed the district court's conclusion that plaintiff's "receipt of a letter of warning did amount to an adverse

---

[10] Plaintiff relies heavily upon *Smith*. ECF 16-2 at 15-16.

action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination." This decision, which is more recent than the cases recounted above, provides helpful guidance when considering whether a formal reprimand constitutes a materially adverse action. Like the "letter of warning" in *Barnes*, the Direct Order explicitly warned Staggers that "[f]ailure to follow this direct order may result in disciplinary action being taken against [him], up to and including [his] removal from the Federal service." ECF 3-10 at 2. Accordingly, at this juncture, Staggers has adequately alleged that the Direct Order constituted an adverse action for the purposes of a Title VII retaliation claim.

Staggers has also adequately alleged a causal connection between his protected activity and the Direct Order. He engaged in protected activity on September 20, 2018, when he amended his EEO complaint. ECF 1, ¶ 36. The Direct Order was issued less than two months later, on November 8, 2018. *Id.* ¶ 31. Although the factual record is unclear as to when Nero became aware of plaintiff's protected activity, at the Rule 12(b)(6) stage I must take as true plaintiff's allegation of knowledge. ECF 1, ¶ 16.

The Fourth Circuit has identified a two-month gap as "sufficiently long so as to weaken significantly the inference of causation between the two events." *King*, 328 F.3d at 151 n.5. But, "[t]his Court and the Fourth Circuit have held that approximately two months may be sufficient temporal proximity to establish a causal relationship." *Alexander*, 2019 WL 2162286, at *13.

Accepting the allegations here as true, as I must at this juncture, and drawing all reasonable inferences in plaintiff's favor, as I must, he has sufficiently alleged, on the basis of temporal proximity, a causal link between his protected activity of September 20, 2018, and the adverse action on November 8, 2018.

## V.  Conclusion

For the reasons stated above, I shall construe the Motion as a motion to dismiss, and grant

it in part and deny it in part.

An Order follows, consistent with this Memorandum Opinion.


Date:   December 17, 2021                              /s/
                                                Ellen L. Hollander
                                                United States District Judge